[No. 127. Decided March 12, 1891.]

P. BANNER *et al.* v. L. J. MAY, D. B. MAY AND B. E. SNIPES.

FRAUDULENT CONVEYANCES.

Where a debtor in failing circumstances transfers all her real and personal estate for an inadequate consideration to one creditor who is cognizant of the fact that other creditors are pressing for payment of their claims, and the creditor to whom the property has been transferred allows the debtor and her husband to remain in possession and control of the property, making payment to creditors out of the rents and profits thereof, the conveyances will be set aside as fraudulent and void as against creditors.

*Appeal from Superior Court, Yakima County.*

The facts are fully stated in the opinion.

*D. J. Crowley,* and *Whitson & Parker,* for appellants.

Fraud is established by circumstances. It can seldom be proved directly. Bump, Fraud. Conv. (3d ed.), pp. 600, 601; Wait, Fraud. Conv., §§ 224, 228; *Rea v. Missouri,* 17 Wall. 532; *Purkitt v. Polack,* 17 Cal. 327; *Jackson v. Mather,* 7 Cow. 301. The law has denominated certain circumstances as badges, signs or evidences of fraud. Among the badges which have been held sufficient to invalidate a sale, and which are found in this case, are the following: Conveyance of the whole estate of the debtor. Bump, Fraud. Conv. (3d ed.), p. 34; Wait, Fraud. Conv., § 231; *Sayre v. Fredericks,* 16 N. J. Eq. 205. Vendor remaining in possession of property and applying proceeds and profits to his own use. Bump, Fraud. Conv. (3d ed.), p. 49; Wait, Fraud. Conv., § 241; *Lukins v. Aird,* 6 Wall. 78; *Callan v. Statham,* 23 How. 477; *Decker v. Wilson,* 45 N. J. Eq. 772 (15 Atl. Rep. 816). A transfer when suits are pending or threatened against grantors. *Stoddard v. Butler,* 20 Wend. 507; *Godfrey v. Germain,* 24 Wis. 410; *Glenn v. Glenn,* 17 Iowa, 498; *Hudgins v. Kemp,* 20 How. 45; *Garland v. Rives,* 4 Rand. 282 (15 Am. Dec. 756). Failure to take inventory and account of stock. *Gollober v. Martin,* 33 Kan. 252 (6 Pac. Rep. 267); *Redhead v. Pratt,* 72 Iowa, 99 (33 N. W. Rep. 382). Fraudulent statement of consideration. Bump, Fraud. Conv. (3d ed.), p. 42; Wait, Fraud. Conv., § 228. Inadequacy of consideration is a badge of fraud. *Kempner v. Churchill,* 8 Wall. 362; *Clark v. Depew,* 25 Pa. St. 509 (64 Am. Dec. 717). A sale under unusual circumstances and out of the usual course of business, and where grantee enters into a business foreign to his own, is tainted with suspicion. Bump, Fraud. Conv. (3d ed.), pp. 51, 52.

It is not necessary that the grantee should have actual knowledge of the debtor's intent to delay, hinder or defraud his creditors, in order to render the transfer void. A knowledge of facts sufficient to excite the suspicions of a prudent man and to put him on inquiry, or to lead a person of ordinary perception to infer fraud, or the means of knowing by the use of ordinary diligence, amounts to notice, and is equivalent to actual knowledge in contemplation of law. *Clements v. Moore,* 6 Wall. 312; *Lukins* v. *Aird,* 6 Wall. 78; *Bartles* v. *Gibson,* 17 Fed. Rep. 293; *Green v. Tantum,* 19 N. J. Eq. 105, and 21 N. J. Eq. 364; *Mills v. Howeth,* 19 Tex. 257 (70 Am. Dec. 331); *Smith v. Vreeland,* 16 N. J. Eq. 198; *Temple v. Smith,* 13 Neb. 513 (14 N. W. Rep. 527); *Gollober v. Martin,* 33 Kan. 252 (6 Pac. Rep. 267). If the grantee paid full consideration for the property he is not protected by it, if he knew of the fraudulent design of the grantor, or had sufficient to put him upon inquiry.

*Reavis & Mires,* and *W. Lair Hill,* for appellees.

Burden of proof rests on creditors who impeach the conveyances. *Johnson v. McGrew,* 11 Iowa, 151 (77 Am. Dec. 137); *Hempstead v. Johnston,* 18 Ark. 123 (65 Am. Dec. 458, and notes). Fraud cannot be inferred from the fact that sale necessarily gave preference. *York County Bank v. Carter,* 38 Pa. St. 446 (80 Am. Dec. 494). Fraudulent intent must be proved; suspicion is not enough; inadequacy of price is not sufficient. *Jaeger v. Kelley,* 52 N. Y. 274. Snipes, as purchaser, could properly testify as to his intentions. *Starin v. Kelly,* 88 N. Y. 418; *Seymour v. Wilson,* 14 N. Y. 567; *Bedell v. Chase,* 34 N. Y. 386. When the vendee purchases property for the sole purpose of receiving payment of an honest debt, the fact that the vendor sold with intent to hinder and delay his creditors does not make the sale void as to such creditors, and thus, although the vendee had knowledge of such intent, it must be made to

appear that the vendee participated in the fraudulent intent. *Dudley v. Danforth*, 61 N. Y. 626. Although the purchase exceeds the amount of the indebtedness, still, if the excess is reasonably necessary for attaining the lawful purpose of satisfying the actual debt, the purchase to the whole extent may be attributed to the motive of self-interest, and therefore the mere fact of the excess does not of itself invalidate the transaction unless there are other circumstances tending to show fraudulent intent on the part of the purchaser. Bump, Fraud. Conv., p. 194, and authorities cited. The possession of land transferred is not a badge of fraud. Bump. Fraud. Conv., p. 121.

The opinion of the court was delivered by

STILES, J.—The plaintiffs below, who are appellants here, were judgment creditors of the appellee Laura J. May, who for a number of years carried on business as a merchant, with her separate property, at Yakima city. Mrs. May, in addition to her stock of merchandise, owned a number of town lots, and several hundred acres of farming land, and a flour mill. The mill was at Yakima city, and was operated by her. D. B. May was the husband of Mrs. May, but had no interest in the property or business involved in the cause. Prior to March 14, 1881, Mrs. May had carried on her merchantile business, and on that day she bought from the defendant Snipes a stock of goods then at Yakima city, and in payment therefor gave him her note for $16,213, payable ten months after date, with interest at one per cent. per month. On the day of its date $530 was credited on the note, leaving its actual principal $15,683. No further credits appear on the note. On December 11, 1883, Mrs. May executed to the defendant Snipes a bill of sale of her stock of goods, and the appliances and appurtenances connected therewith, and her safe, all book accounts, wheat and flour at the mill, a lot of hogs, hay, horse, wagon

and harness, and two lots of bacon, stored in Yakima; and at the same time she executed to the same party a deed of all her real estate in and about Yakima, excepting eighty acres of land called the "family homestead." These two conveyances embraced all of Mrs. May's property excepting the homestead and household goods. The consideration expressed in the bill of sale was $16,150; that in the deed was $17,225.66. The consideration claimed to have been paid was $10,505 in money, the principal of the note above alluded to ($15,683), and interest thereon to date $5,159.75, the sum of $5,548.75 due to one Murray, and the sum of $2,400 due to the First National Bank of Yakima; making a total of $39,311.14, or $5,935.48 more than was expressed in the conveyances. The amounts due Murray and the First National Bank were secured by attachments upon more or less of the property, and were assumed by Snipes; and we find that these amounts and the $10,505 cash were actually paid by him, in all $18,453.75. Of the amount involved in the note we shall speak later. The conveyances above alluded to were made under the following circumstances: Mrs. May, in addition to Murray, the bank and Snipes, owed numerous other creditors in Portland, Or., San Francisco, Cal., and the Territory of Washington, various sums, aggregating, according to her statement, some twenty or thirty thousand dollars. Her creditors in Portland were pressing her for money, and the attachments of Murray and the bank had just been levied. Mrs. May was sick, and confined to her room. It does not appear what occurred between her and Mr. May; but on the evening of December 9th he left Yakima, and drove by team to The Dalles, Or., about ninety-five miles distant, found Snipes, and returned with him to Yakima, arriving back about 2 o'clock on the morning of the 11th. Between that time and the evening of the 11th the bill of sale and the deed were agreed upon, prepared, executed and delivered, Snipes

giving his check, payable to Mrs. May, for $10,505. The auditor's office was then closed, but Snipes found the auditor and left the conveyances with him for record. They were recorded the following morning at 9 o'clock. Snipes left again for The Dalles on the night of the 11th; and May, with his wife's indorsement on the check, proceeded with such expedition that the check was paid December 13th by French & Co., bankers at The Dalles. The money, the proceeds of the check, was kept by May at The Dalles thereafter. Certain of the Portland creditors of Mrs. May, finding her without property or apparent means of paying their claims, agreed with her to a settlement of fifty cents on the dollar; thirty cents of which was to be paid in cash, to be produced by Mr. May at the proper time, and the balance in deferred notes. This settlement involved the payment of about $5,000, and was carried out about the month of May, 1884, by one Williams, as agent of the creditors, at Yakima. The contract of compromise was prepared at Portland, and taken by Williams to Yakima. There, however, was difficulty in concluding it, as May did not have the money there. The business of the settlement was carried on by Williams, May, Snipes, and the counsel of the latter; Williams insisting that Snipes should pay the money, as otherwise the creditors would attach him on the ground that the sale by Mrs. May to him was fraudulent. May claimed that he could have the money in a few days, and it was finally agreed that Snipes should give his check for the amount necessary, but that it should not be presented for a certain number of days—time enough for May to produce the money. The check was given and paid, and the settlement made; and in due time May brought the money, in coin, to Snipes' place of business at The Dalles. Other creditors, who were not included in the settlement above mentioned, got judgment on their claims, and in December, 1884, brought this action to have the conveyances

of Mrs. May declared to have been a fraudulent assignment, and for other appropriate relief. The testimony was taken before a referee, and, upon submission to the court, judgment was rendered for the defendants.

Appellants maintain that the decision should have been otherwise, upon several grounds, viz.: (1) Representations made by defendant Snipes to Mrs. May's creditors as to her solvency; (2) the circumstances of the transfer; (3) the conduct of the parties after the transfer, the property having been left entirely in the hands of the Mays; (4) the inadequacy of the consideration alleged to have been paid; (5) alleged credits which should have been made on the note; (6) the books of account, their condition, and the absence of some of them. Defendant Snipes was in Portland about November 30, 1883, only ten days before the transfer, and called upon several of the creditors of Mrs. May; told them she had asked him to see them about certain accounts against her which had been sent to Yakima for collection; assured them that she was perfectly solvent, if not pressed; that she owed him a small amount; that if he had any money to loan he would lend it to her as soon as to any one; and that, if he got money he expected shortly, he would advance enough to her to pay them. These statements were made for the purpose of quieting all the May creditors, and, had Murray been content like all the rest, the transfers might never have been made to Snipes; but they showed knowledge on the part of Snipes that Mrs. May had pressing creditors, whether he knew her actual financial condition or not. He denied such knowledge, and gave a somewhat different version of the Portland interviews; but we are constrained to conclude as above under the testimony. With the property under attachment in the Murray and National Bank suits, May, with little or no consultation with his wife, made the trip to The Dalles and return, traveling thirty-six hours without rest at the rate of

five miles an hour. His object was to borrow enough money from Snipes to pay off Murray and the bank, and thus relieve the pressure from other creditors. Snipes refused to make the loan, but, acting on the information conveyed to him by May, started back to Yakima with him at once to secure himself. He was preparing to attach, so as to be secured ahead of the Portland and other creditors except Murray and the bank, when the proposition was made by May to sell him the whole property. What terms the first proposal was based upon was not shown, but an agreement was very soon reached by which Snipes, in addition to his existing claim of upwards of $20,000, should forthwith pay out nearly $18,500 in cash. He might have attached, and, after paying out the Murray and bank claims would have saved his $10,505 check, and whatever surplus there was after re-imbursing him would have gone to other creditors. The plan adopted gave him everything, and placed the $10,505 out of the state, and beyond the reach of creditors, except by such chance as might favor them. In this proceeding we conclude that Snipes willingly assisted the Mays, both to prefer himself and to put other creditors at such a disadvantage as would compel them to accept such terms of settlement as might be offered, as was done in the case of creditors represented by Williams, thus hindering and delaying them. The deed and bill of sale having been executed and recorded, as was before stated, Snipes returned to The Dalles, and May went there also. No third person was put in charge of the property which was released from the attachments, and everything seemed to be in the possession of Mrs. May as before. But it was shown that whereas Mr. May had before managed the business and property as the agent of Mrs. May, he was now appointed to manage it as the agent of Mr. Snipes, with the exception that the mill was now managed by the miller. Mrs. May's name was painted out of the store

sign, leaving the space blank. Business at the store was resumed, and goods sold for cash and on credit; accounts were collected, buildings were rented, farm products were gathered and sold, and in a few instances local creditors of Mrs. May were allowed to credit goods sold them upon their claims, with the knowledge and assent of Snipes. In like manner, in other instances notes held by Mrs. May at the time of the transfer were given to her creditors, and the proceeds allowed to be retained by them in satisfaction of their demands. No new goods were purchased, but Snipes did not pay any personal attention to matters, and rarely saw any of his property. It was said that new books were opened the next day after the transfer, but, although strenuously demanded at the hearing, they were not produced, with the exception of one, which will be alluded to further on. These books, however, were not claimed to have contained any statement of account between Snipes and his agent, May. No cash account whatever was kept. No agreement was made with May as to his compensation for his services as agent, and no settlement was ever made between the employer and his agent, although it was stated by Mrs. May that the money received was turned over to Mr. Snipes; but when, and how much, did not appear, and Snipes did not so testify. This state of things continued from December 11, 1883, until a certain day in June, 1885, when, owing to disagreements between May and his wife, he left Yakima never to return. A divorce was procured by her soon after; May going into the employ of Snipes elsewhere, and Mrs. May remaining at Yakima. The significant matter in this was that, although it was claimed that May was the agent, he went away, while the wife remained, and, without any word of arrangement between her and Snipes, went on with the business as though her husband had never been there. Mrs. May kept on gradually closing out the goods until

July, 1886, when a mere remnant remained, and when, with this remnant and $600 in money, furnished her by Snipes, she removed to North Yakima, and set up a millinery and fancy goods store. This store, she testified, belonged to Snipes, she acting as his agent for a percentage of the profits, but what percentage she could not state; and the fact was that she conducted it as her own business, and advertised it in the papers as hers. But of this stock, even, goods were given to one of her old creditors on account until the testimony was being taken in this case.

From these facts appellants contend the proper deduction to be that the deed and bill of sale of Mrs. May were colorable only, and were intended, while they secured Snipes, to leave her to do practically as she pleased with the personal property, at least, and the rents and proceeds of the lots and land, without possibility of interference from her creditors. Concerning the value of the property, there was much controversy. The values fixed by the court below, however, were just what was admitted by the defendants, and nothing more, viz., the mill and appurtenances, $5,000; the stock of goods, $14,000; the other personal property, $3,500; a total of $22,500. It also allowed a balance on the books of Mrs. May against Snipes of $5,939.48, but where this came from we are unable to ascertain. Nobody testified to it, or anything like it, except that Snipes said that was the amount agreed upon when the transfer was made. The only ledger produced by the defendants showed a balance of account due Mrs. May from Snipes, June 27, 1882, of $9,325.24. The journal following immediately upon this ledger, and running to December 11, 1883, contained further charges against Snipes of $4,530; and other memorandum account books covering the same period contained charges against him of $840. These made a total of $14,795.24. Upon the same journal and memorandum books appear credits to Snipes of $7,945.50, including a

disputed item of $7,000. Deducting the credits from the charges, the balance is $6,849.74, which seems to be correct, and made an error in Snipes' favor of $910.26. Again, Snipes admitted that the merchandise he obtained from Mrs. May was to be credited upon his note; but no credit was ever made, and he was allowed interest on the whole principal to the date of the transfer (two years and nine months) at 1 per cent. per month, amounting to $5,159.75. Had there been a careful settlement of the matter between the parties, each being mindful of his rights, this interest charge would have been reduced by nearly one-half. Next, although the transfer included all the accounts, etc., held by Mrs. May, no value whatever was allowed for them. On the face of the books presented, it was not disputed that some $30,000 of charged accounts appeared, exclusive of those against Snipes, all, with the exception of about $2,000, having been entered since June 27, 1882. The court below made no finding at all as to these accounts. They were of some value, for it was proven that certain of them were paid after the transfer; but we cannot undertake to say more than that they actually increased the value of the property to some extent. Lastly, the real estate. The court below estimated all of it, exclusive of that upon which the mill stood, at $12,223, just $2.25 less than the consideration expressed in the deed. There was no testimony whatever to support this valuation excepting that of Snipes, who fixed no value upon any parcel but the town lots. These he admitted to have been worth $50 each, or $3,300 for the sixty-six, and the improvements at $1,500; and remarked that he paid more than lots and land were worth. The land amounted to about 400 acres, and cost him $7,423, or $18.55 per acre. Plaintiffs called five disinterested witnesses of the vicinity, fairly qualified to judge of the values of the real property. Of these the lowest gave the value of the land at $13,000,

of the lots $6,600, and of the improvements, $6,400; making a total of $26,000, as against $12,225.25, admitted to have been paid. None of these witnesses fixed the total value of the property conveyed, exclusive of the book accounts, at less than $48.960. In the face of such testimony we can see no reason why the statement of the defendants should have been accepted as verity, unaccompanied as it was with any particularization, and unsupported by any disinterested witness; and we conclude that the property conveyed was undervalued to the extent of at least $20,000, so that Snipes, instead of paying $10,500 to the Mays, should have paid nearly or quite three times that amount on any fair basis of calculation.

Mrs. May kept a set of merchantile books from the inception of her business in 1879 until the date of the transfer, December 11, 1883. From that time on, it was claimed, a new set of books was kept, at least until June, 1885, when her husband went away. Mr. May was the bookkeeper. At the hearing before the referee, which commenced in February, 1886, and on May 4th thereafter, the referee ordered the defendants to produce their books. Various adjournments were had until July 30th before any books were forthcoming. Mr. May in the mean time testified that on May 30, 1884, three of the important books were taken from the store by some one unknown, and he was able to produce only Mrs. May's first ledger, covering her business from 1879 to June 27, 1882; her journal daybook from the last date to and including December 10, 1883; nineteen small memorandum books, from some of which the journal appears to have been posted, and the last of which stops with December 10; and one sale memorandum book, commencing December 12, 1883, and running to September 23, 1884, "Exhibit E." The ledger was well kept, and showed long and hard usage, and with a single exception the accounts in it ended July 27, 1882, and

where they were unbalanced showed transfers to "Ledger B." But the account of Leonard Thorp was continued to the second of August following. The journal or day-book was a very much newer book, and had few signs of wear, though it covered a period of $16\frac{1}{2}$ months, and had nearly 500 pages of entry. Appellants claim that this book was made up by defendant May between the time the books were called for in May, 1886, and the time when they were produced in July. This we think to be a well founded claim, based upon three grounds, viz.: At the head of several pages near the beginning of the book the year 1882 is written over the date 1883, a thing not likely to occur when a book is posted up with any regularity; some forty names of persons here and there appear with items charged or credited, and no amounts carried out, showing hasty work, and no posting to a ledger; and, lastly, the items in the ledger account of Leonard Thorp, which were presumably posted from this journal, on the debtor side, show them as transferred from pages 16, 27, 52, 57 and 59, whereas in the journal they appear on pages 11, 15, 36, 41 and 42, and on the credit side items from pages 6, 16 and 27 appear in the journal at pages 4, 11 and 19, showing almost to a demonstration that this journal has been shortened up, so that the business recorded in it does not occupy as many pages as the book from which the ledger was posted. But no great moment would be attached to these matters, since the journal in the main contains a correct transcript of the memorandum books, were it not that the item of $7,000, alleged by Snipes to have been given to May, September 20, 1882, has no other support than that it appears on that date in the memorandum book No. 9, and at the corresponding place in the journal. No writing whatever was taken by Snipes for this advance, and no time was stipulated for its return. The entry in the memorandum book

was made in lead-pencil, as were all the other entries in it, but this one was clearly made over other previous entries which were partially rubbed out with an eraser. It is at the top of the page, and the same entry was made on the bottom line of the same page, and partly rubbed and partly scratched out. Had the defendants been examined upon the condition of these books, and of this item especially, as it appears in the books, and had they given no reasonable explanation of the matter, we should reject the item of $7,000 as fraudulent; but no question was asked them concerning it, and it will therefore stand. The way in which the defendant treated the matter of the books is one of the strongest proofs against them. From early in 1884 they knew that creditors were claiming their transaction of December 11, 1883, to have been fraudulent, and suits were pending against Mrs. May which were intended to be the basis of this suit. Snipes was a man of very large business affairs, with mills, stores, cattle and other property scattered over a large area in Oregon and Washington. He was not a book-keeper himself, and has no knowledge of accounts; but he knew the importance of them, and had his agents in other branches of his business keep them; and it is beyond conception that in so questionable a transaction as this was on the face of it, he should entirely have neglected so important an element of defense by suffering honestly kept books of accounts to be lost when there was a very expensive safe among the very property turned over to him. This concludes the review of the main facts as disclosed by the evidence.

The law of the case is very simple. It is that, when such facts are shown to exist, they tend to prove a legal fraud upon creditors; and when many such facts exist together, each with its tendency to prove fraud, they compel the belief that a fraud was intended by the Mays, and was

assisted in by Snipes. If it were otherwise, the defendants, though having the opportunity, wholly neglected to explain any of the many damaging circumstances appearing against them. Therefore the judgment of the lower court must be reversed. The judgment will be that the bill of sale and deed of December 11, 1883, be declared null and void as against the appellants' several judgments; that the property covered thereby, and still remaining in the hands of the defendants, or either of them, and not transferred to innocent third parties, or so much thereof as may be necessary, be sold, and the proceeds paid to the appellants according to their said judgments; that if the said proceeds of sale shall not be sufficient to pay said judgments, then the said defendant Snipes is adjudged to be liable for the deficiency to the extent of $17,500, being the admitted value of personal property received by him, with interest thereon at the rate of 10 per cent. per annum from December 11, 1883, and upon the ascertainment of the amount of said deficiency, if any, execution may issue against the property of said Snipes therefor. Costs to appellants.

ANDERS, C. J., and HOYT, DUNBAR, and SCOTT, JJ., concur.